IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

ANGELA THACKER, as Personal
Representative of the Estate of
RABEN CRISEL,

        Plaintiff,

v.                                         Civil Action No.: 3:15-CV-13388

SEVENTEENTH STREET ASSOCIATES, LLC d/b/a
HUNTINGTON HEALTH AND REHABILITATION CENTER;
SMV HUNTINGTON, LLC;
SSC HUNTINGTON OPERATING COMPANY LLC;
SSC SUBMASTER HOLDINGS LLC;
SSC EQUITY HOLDINGS MT LLC;
SAVASENIORCARE, LLC; and
SSC SPECIAL HOLDINGS LLC,

        Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTIONS TO DISMISS FILED BY DEFENDANTS
SSC HUNTINGTON OPERATING COMPANY LLC, SSC SUBMASTER HOLDINGS LLC, SSC
EQUITY HOLDINGS MT LLC, AND SSC SPECIAL HOLDINGS LLC**

I.       INTRODUCTION

      Defendants SSC Huntington Operating Company LLC, SSC Submaster Holdings LLC,

SSC Equity Holdings Mt LLC, and SSC Special Holdings LLC (collectively, "SSC Defendants")

have each filed separately with this Court nearly identical motions and supporting

memorandum of law seeking dismissal of the claims against them pursuant to Rules

12(b)(1), (2) and (6) of the Federal Rules of Civil Procedure.

      Each of the Defendants asserts that it is an improper party due to a lack of presence

in West Virginia and has disclaimed its involvement in the care and treatment of the injured,

and now deceased Plaintiff, Mr. Raben Crisel. In addition to a near-identical Motion and Memorandum of Law, a nearly identical version of the 'Declaration of Wynn G. Sims' ("Sims Declaration") is proffered in support of each of the SSC Defendants' motions. In an effort to ease the burden on this Court, Plaintiff has hereunder consolidated its response in opposition to the SSC Defendants' motions, and included short sections specific to each SSC Defendant, as needed, below.

The West Virginia Medical Professional Liability Act ("MPLA"), codified at W.Va. Code § 55-7B-1 *et seq.,* defines a "health care facility" as including "any related entity to the health care facility." See W. Va. Code § 55-7B-2(f). In further defining "related entity" at subsection (n), the legislature drafted the provision to include "any corporation, foundation, partnership, joint venture, professional limited liability company, **limited liability company,** trust, affiliate or other entity **under common control or ownership, whether directly or indirectly, partially or completely, legally, beneficially or constructively,** with a health care provider or health care facility; or **which owns directly, indirectly, beneficially or constructively any part of a health care provider or health care facility.**" See W. Va. Code § 55-7B-2(n) (*emphasis added*).

As will be shown through deposition testimony and the exhibits submitted in support of the SSC Defendants' motions to dismiss, the SSC Defendants are "related entities" subject to the jurisdiction of this Court.

II.     STANDARD OF REVIEW

A.  Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1)

A motion to dismiss pursuant to Rule 12(b)(1) raises the fundamental question of whether a court is competent to hear and adjudicate the claims brought before it. Federal courts derive their jurisdictional power to hear cases and controversies from Article III of the

Federal Constitution. It is axiomatic that a court must have subject matter jurisdiction over a controversy before it can render any decision on the merits. Challenges to jurisdiction under Rule 12(b)(1) may be raised in two distinct ways: "facial attacks" and "factual attacks." *Thigpen v. United States*, 800 F.2d 393, 401 n. 15 (4th Cir.1986), *rejected on other grounds, Sheridan v. United States*, 487 U.S. 392 (1988). In this case, SSC Defendants have facially attacked Plaintiff's Complaint. A "facial attack" questions whether the allegations in the complaint are sufficient to sustain the court's jurisdiction. *Id*. If a "facial attack" is made, the court must accept the allegations in the complaint as true and decide if the complaint is sufficient to confer subject matter jurisdiction. *Id*.

### B. Personal Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(2)

A court has many options when deciding whether personal jurisdiction exists. A court may, "[i]f the existence of jurisdiction turns on disputed factual questions ... resolve the challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir.1989). A court may also decide the question "'on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint.'" *New Wellington Fin. Corp*., 416 F.3d at 294 (*quoting Combs*, 886 F.2d at 676). In that context, "'the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge.'" *Id*. (*quoting Combs*, 886 F.2d at 676). "Under such circumstances, courts 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.'" *Id*.

Specific to the present matter, while the law presumes that two separately incorporated businesses are separate entities, formal separate corporate structures will not

prevent the assertion of jurisdiction over a nonresident corporation where some control is exercised by the nonresident corporation over the corporation doing business in the state. *See Bowers v. Wurzburg*, 202 W.Va. 43, 501 S.E.2d 479 (1998). Additionally, this Court has made clear that in cases such as the one at hand, where a maze of corporate entities has been created, "decisions to look beyond and through corporate facades must be made case-by-case, with particular attention to factual details." *O'Bryan v. Synthes, Inc.*, No. 5:13-CV-25981, 2014 WL 297835, at *5-6 (S.D.W. Va. Jan. 27, 2014).

While all relevant factors must be considered, some of the more pertinent factors to be considered include: (1) whether the parent corporation owns all or most of the capital stock of the subsidiary; (2) whether the parent and subsidiary corporations have common officers and directors; (3) whether the parent corporation finances the subsidiary; (4) whether the parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation; (5) whether the subsidiary has grossly inadequate capital; whether the parent corporation pays the salaries and other expenses or losses of the subsidiary. *See Bowers*, 202 W.Va. at 43 (1998).

### C.  Failure to State a Claim Pursuant to Fed. R. Civ. P 12(b)(6)

When reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, this court accepts as true the facts alleged in the complaint, views them in the light most favorable to the non-movant, and recognizes that dismissal is inappropriate unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts that could be proved in support of its claim. *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (*quoting Twombly*, 550 U.S. at 556, 127 S.Ct.1955).

III.    ARGUMENT

    A.    Viewed in a light most favorable to Plaintiff, the "pleading allegations" and the facts of this case demonstrate that Plaintiff has established a "prima facie showing" of in *personam* jurisdiction over Defendant SavaSeniorCare, LLC.

In the case at hand, the SSC Defendants contend that this Court lacks *in personam* jurisdiction because they lack a "**presence in West Virginia and ha[ve] absolutely nothing to do with the [local] Facility's [Seventeenth Street Associates, LLC d/b/a Huntington Health and Rehabilitation Center] care and treatment of Mr. Crisel.**"[1]   *See* 'Memorandum in Support' filed by each SSC Defendant in support of its Motion to Dismiss Plaintiff's Complaint (hereinafter "SSC Defendants' Memorandums") at page 1-2.   Following this emphatic contention and the denouncement of Plaintiff's Complaint as "unfortunate" and "indiscriminate," the SSC Defendants each attempt to utilize the declaration of Wynn G. Sims to profess all of the reasons they are not subject to the *in personam* jurisdiction of this Court. Plaintiff argues that the Sims Declaration hurts, rather than helps, the SSC Defendants' position by further highlighting the degree of interrelation between and among these co-Defendants in the following ways:

    1.    The Sims Declaration filed as Exhibit B to Defendant SSC Equity Holdings MT LLC's Motion to Dismiss affirms that Ms. Sims is the Vice President and Secretary of Defendant SSC Equity Holdings MT LLC, which company is registered to do business in West Virginia and also serves as the holding company for its indirect membership interests in the Facility. [Doc #8-2, filed October 23, 2015].

---

[1] Seventeenth Street Associates, LLC d/b/a Huntington Health and Rehabilitation will hereinafter be referenced as the "Facility" or "local facility."

2.    The Sims Declaration filed as Exhibit B to Defendant SSC Huntington Operating Company LLC's Motion to Dismiss affirms that Ms. Sims is the Vice President and Secretary of Defendant SSC Huntington Operating Company LLC, which company is registered to do business in West Virginia and also serves as the holding company for its membership interests in the Facility. [Doc #10-2, filed October 23, 2015].

3.    The Sims Declaration filed as Exhibit B to Defendant SSC Submaster Holdings LLC's Motion to Dismiss is actually the Sims Declaration drafted in 'Support of Defendant SavaSeniorCare, LLC's Motion to Dismiss' and affirms that Ms. Sims is also the Assistant Secretary of SavaSeniorCare, LLC [Doc. #14-2, filed October 23, 2015].

Ms. Sims previously declared that SavaSeniorCare, LLC is the holding company for all of the stock and interests of its "various direct and indirect subsidiaries," as well as the sole member of a non-party LLC "which is the sole member of Defendant SSC Equity Holdings MT LLC...which is the sole member of non-party West Virginia Holdco, LL, which, in turn, is the sole member of Defendant SSC Huntington Operating Company LLC, which, in turn, is the sole member of Defendant Seventeenth Street Associates LLC d/b/a Huntington Health and Rehabilitation Center ("Facility")." Prior Declaration of Wynn G. Sims filed the related matter of *Crabtree v. Harrison*, Case 3:15-cv-13318, Document 13-2 at ¶ 3, filed on 09/25/15.

Despite the obvious degree of ownership and control exhibited by the SSC Defendants, the reasons the SSC Defendants give for avoiding the personal jurisdiction of this Court include, but are not limited to: (1) they hold only "a distant, indirect ownership interest in the Facility"[2]; (2) they "had no control over the Facility's operations or its provision of care to residents, including Mr. Crisel"; (3) "none of the facility's staff is employed by or an agent of" the SSC Defendants; (4) the SSC Defendants "never ha[ve] had employees or agents at the Facility, or any other healthcare facility in West Virginia"; (5) they did "not prepare or issue paychecks to employees of the Facility"; (6) the SSC Defendants "do not devise or implement other policies or procedures for the Facility"; (7) they have never made "human resources, staffing, training, or budgeting decisions with respect to the Facility, or supervised the Facility's employees"; (8) the SSC Defendants "do not derive any revenues from the Facility or any other source in West Virginia"; (9) they "ha[ve] no right to control the

---

[2] The "distant" and "indirect" relationship professed by the SSC Defendants and by SavaSeniorCare, LLC is revealed to be a direct and closely held relationship via the prior and other certain version of the Sims Declaration.

6

Facility's management or operations"; and (10) the SSC Defendants have "no right to share in the profits, nor has a duty to pay any losses, of the Facility."  See SSC Defendants' Memorandum at pages 2 through 4, generally.

The SSC Defendants clearly seek to distance itself from the local facility in order to gain their dismissal from this matter. However, in addition to the Sims Declarations which clearly tie the SSC Defendants together in one direct chain of ownership, the defendants' contentions are also contradicted by the sworn testimony of the local facility's administrator, Annica Stansberry. Ms. Stansberry proffered this testimony in three depositions on three different cases.  Plaintiff's counsel took those depositions on October 16, 2006, May 29, 2008, and January 6, 2015 and the testimony is as follows:

**October 16, 2006 deposition testimony**

> Q.    The facility in Huntington that you work at currently is Mariner Health Care Center?
> A.    No, sir.
> Q.    What's the name of it?
> A.    Huntington Health and Rehabilitation.
> Q.    Has that been the name of the facility since you started there?
> A.    No, sir.
> Q.    Do you remember the date you started?
> A.    Yes, August 27th, 2003.
> Q.    What was the name of the facility at that time?
> A.    Mariner of Huntington.
> Q.    Mariner of Huntington?
> A.    Yes, sir.
> Q.    It's currently Huntington Health and Rehab?
> A.    Huntington Health and Rehab.
>
> Q.    And has it gone by any other names?
> A.    No, sir.
> **Q.    Do you know why the name change was implemented?**
> **A.    Yes, sir.**
> **Q.    Why?**
> **A.    We were bought by another company.**

7

Q.      Who owned the company when you started in August '03?

A.      Mariner.

Q.      Where are they located?

A.      Well, they have offices in Atlanta and Houston.

Q.      Where was the first place?

A.      Atlanta.

Q.      And Houston?

A.      Uh-huh.

Q.      Do you know which one is the official headquarters?

A.      No, sir.  They have different functions.

Q.      And when did Huntington Health – who were they bought out by, Mariner?

A.      Sava Senior Care.

Q.      Can you spell that?

A.      S-a-v as in Victor –a.

Q.      Sava what?

A.      Senior Care.

Q.      And when did that occur, the buyout?

A.      In – I don't know the date of the buyout.

Q.      When did it start operating as Sava – or when did it start operating as Huntington Health and Rehab?

A.      January 13th of 2006.


Q.      Where is Sava headquartered?

A.      They have field offices in Atlanta and Houston.

Q.      To your knowledge, do they operate any other facilities in West Virginia, other than Huntington Health and Rehab?

A.      No, sir.


May 29, 2008 deposition testimony

Q.      And who is the current owner (of Huntington Health and Rehabilitation)?

A.      Sava, S-A-V as in Victor, A, Senior Care.

Q.      Where are they located?

A.      They have offices in Atlanta, Georgia and Houston, Texas.

Q.      And how many nursing homes do they own; do you know?

A.      Approximately 188.

Q.      And how many do they own in West Virginia?

A.      One.

Q.      Are they your employer; is that who your check is –

8

A.      Sava Senior Care, yes, sir.
Q.      Okay.  And you're an adminis – the administrator at this facility, right?
A.      Yes, sir.


January 6, 2015 deposition testimony

Q.      Okay.  From a prior deposition that you gave back in, I guess, 2008, which may have been something you were more familiar with then, because it was closer in time, you said Mariner Health Care was sold to the current owner who was Victor Sava.
Mr. Stewart:   Sava Senior Care.
By Mr. Paternostro:
Q.      **Sava Senior Care, does that ring any bells for you?**
A.      **That's a management company, a consulting company.**
Q.      Okay.  I'm going to read you what some of the questions and answers were.  Okay?  And this is just to see if we can get straight who owns what.  "Who was the owner when it was Mariner of Huntington?"
You said, "Mariner Health Care."
"And it was sold?"
You answered, "Yes."
"To the current owner?"
"Yes." And this is back in 2008.
"And who is the current owner?"
And then you said, "Sava, S-a-v, as in Victor, -a Senior Care."
"Where are they located?"
"They have office in Atlanta, Georgia, and Houston, Texas."
"How many nursing homes do they own?  Do you know?"
"Approximately 188."
"And how many do they own in the State of West Virginia?"
"One."
"And is that the one you work at?"
"Yes, sir."
"Are they your employer?  Is that what your check is?"
And then you answered, "Sava Senior Care, yes, sir."
Does that ring any bells?
A.      (Nods negatively.)

Q.      So who was this Senior Care – Sava Senior Care that you talked about owning approximately 188 facilities, one of them being in West Virginia? Who is that?

A.      I believe I just answered that.  That's a consulting firm.

Q.      Okay.  Do they own Seventeenth Street Associates?

A.      I have no idea.

Q.      I asked you this question.  "Are they your employer?  Is that what your check is?"
        And then you answered, "Sava Senior Care, yes, sir."
        Okay? That was back in May of 2008.  That's what you said under oath.  Is there something that has changed since then?

A.      I have no idea.  I work for Seventeenth Street Associates.


Q.      Okay.  How about Wynn Simms? W-y-n-n.

A.      I know who she is.

Q.      Okay.  Would it – do you know what – who is she?

A.      She works for either the consulting company or – I don't know what the other part of it's called.

Q.      Do you use a consulting company as – You're employed by who?

A.      Seventeenth Street Associates.

Q.      Okay.  Do you use a consulting company for certain aspects of your facility?

A.      There are two branches, and I think one of them may – I don't know what the other one's called.  It's Sava Senior Care Consulting, and then there's another piece of it, and one of them provides things like HR services, payroll, that kind of thing.  The other one is field support such as – I'm just trying to think of some of the – like management, assistance and field support.


Q.      You believe that there are two entities that provide – What did you call it? Certain services?

A.      Like consulting field support.

Q.      Now, when I took your deposition -- this is a different one in 2006 of October -- I asked where you worked, and you referred to it as Huntington Health and Rehab, previously owned by Manor -- Manor -- Mariner, and I asked you, "Do you know why the name change was implemented?"
        "Yes, sir."
        "Why?"
        "We were bought by another company."

10

Question, "Who owned the company when you started in
August of 2003?"
"Mariner."
"Where were they located?"
"Well, they have offices in Atlanta and Houston."
"And when did Huntington Health -- who were -- who
were they bought out by?" Mariner.  I asked you, "Who
were they bought out by?" meaning Mariner.
You said, "Sava Senior Care."
"When did the buyout occur?  When did it start operating
as Sava, or when did it start operating as Huntington
Health and Rehab?"
"January 13th of 2006."
**Okay?  Does that ring any bells as to who Sava Senior
Care is?**

A.      I just told you that Sava has consulting services.  They
provide field support.  There's another branch that's
called something else.  I – I don't know what you're
asking me.


Q.      Where do you get money from to run your budget?
A.      I don't know the answer to that.
Q.      Well, I mean, do you have a – a bank account in
Charleston that when somebody delivers – or I'm sorry –
in Huntington where someone delivers, you pay for it and
write a check?
A.      We don't have a bank account in Huntington.
Q.      Okay.  Do you write checks for any of the items that
come into the Huntington facility, such as food, linens,
whatever you may need?
A.      There's a very detailed electronic process for that.
Q.      Okay.  Well, who runs that?  Who is the entity or persons
that are – that are making payments on items you need
for your facility?
A.      We have field support services who do accounts
payable.
Q.      Where are they located?
A.      In Houston, the accounts payable office.


Q.      So this field support services entity or whatever they are,
these people, they're located in Houston?
A.      For accounts payable.

11

Q.      The money you get to operate your budget, where does that come from?

A.      I already answered that, sir.

Q.      All of it?

A.      I don't know that.


Q.      All right.   So that money, those expenses, as I understand it, are handled by – at least part of those, some field service support system or field support services system over in Houston.  Is that correct?

A.      I said accounts payable is in Houston, sir.


Q.      All right.  What about your account receivables?  Where do they go?

A.      What do you mean account receivable, where does that go?

Q.      Well, do you get money that comes into your Huntington Health and Rehab Center?  Do they get money?

A.      Yeah.  Yes, sir.

Q.      Okay.  Where's it go?

A.      There's just a detailed process again.   There's an electronic depository, and there is also a locked depository.

Q.      Okay.  Where's it – where does it end up?  Where does this deposited money end up?   Does it end up in Pittsburgh, Houston, Michigan?  I mean, is there some central location the money goes to?

A.      I don't know that.


Q.      And are there policies that are implemented and procedures implemented to prohibit mistreatment, neglect, and abuse of residents at your facility?

A.      Yes.

Q.      And who develops and writes these policies?

A.      I don't know.

Q.      Do they just show up in a little booklet from an unknown source?

A.      We have manuals.

Q.      Where do they come from?

A.      I don't know.[3]

---

[3] The Stansberry deposition testimony is attached to this Response as **Exhibit 1**.

The Sims Declarations that form the basis for SSC Defendants' Motions to Dismiss, along with this sworn testimony of Administrator Ms. Stansberry give a positive inference to Plaintiff's proper inclusion of these "related entities" in this matter, as defined under W.Va. Code 55-7B-2(n).  According to Ms. Stansberry, SavaSeniorCare, LLC is the owner of the local facility and Ms. Stansberry is, or was, an employee of this entity.   Moreover, SavaSeniorCare, LLC currently provides "consulting" and "management" services to the local facility and the flow of money into and out of the local facility involves some entity in Houston- where SavaSeniorCare, LLC and all of the other SSC Defendants are located.

Ms. Stansberry's testimony creates issues of fact that need to be resolved before the SSC Defendants' Motions can be decided.   Those issues include, but are not limited to determining: the degree of interrelation between SSC and the local facility; ownership and management of the local facility; determining which entity provides "consulting services" to the local facility; following the flow of money in and out of the local facility; and determining the employer of local facility employees.

In *Celotex Corporation v. Rapid American Corporation*, 124 F.3d 619 (4th Cir. 1997), the Court set forth the following pronouncement regarding the level of proof by which a Motion brought pursuant to Federal Rule of Civil Procedure 12(b)(2) should be evaluated:

> When, as here, a court's power to exercise personal jurisdiction over a non-resident defendant is challenged by a motion under Federal Rules of Civil Procedure 12(b)(2), the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence.  **Furthermore, when, as here, a district court rules on a Rule 12(b)(2) motion without conducting any evidentiary hearing or without deferring ruling pending receipt at trial of evidence relevant to the jurisdictional issue, but rather relies on the complaint and affidavits alone, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge.   In considering a**

> challenge on such a record, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.

*Id*. at 628 (*citations and quotations omitted*) (*emphasis added*).

With regard to exercising personal jurisdiction over a Defendant, the Court went on to say:

> In order for a court to validly exercise personal jurisdiction over a non-resident defendant:  (1) a statute must authorize service of process on the non-resident defendant, and (2) the service of process must comport with the Due Process Clause.  **Because the West Virginia long-arm statute is coextensive with the full reach of due process, it is unnecessary in this case to go through the normal two-step formula in determining the existence of personal jurisdiction.  Rather, the statutory inquiry necessarily merges with the Constitutional inquiry.**
> A court's exercise of personal jurisdiction over a non-resident defendant is consistent with the Due Process Clause **if the defendant has sufficient "minimum contacts" with the forum such that requiring the defendant to defend its interests in the forum does not "offend 'traditional notions of fair play and substantial justice'."**

*Id*. at 627-28 (*citations omitted*) (*emphasis added*).

Finally, in addition to the Sims Declaration and the sworn testimony of Administrator Annica Stansberry, other facts exist which demonstrate that the SSC Defendants are proper parties to this matter and subject to the in *personam* jurisdiction of this Court.  First, the local facility's financial disclosures for the years 2013 and 2014 are signed by Ken Pitts with an e-mail address of KAPitts@SavaSC.com.  The "Balance Sheets," "Income Statements," and "Trended Summary Budgets" submitted with the disclosures prominently display the moniker SavaSeniorCare.  As we know from the Sims Declarations, this overlapping of corporate officers is also seen with Ms. Sims who serves as the Assistant Secretary of SavaSeniorCare, LLC, the Vice President and Secretary of Defendant SSC Equity Holdings

14

MT LLC, and the Vice President and Secretary of Defendant SSC Huntington Operating Company LLC.

    **B.**    **Plaintiff complied with the West Virginia Medical Professional Liability Act and has properly set forth claims against the SSC Defendants.**

       The argument made by the SSC Defendants that this matter should be dismissed for failure to state a claim against them is as specious as its argument regarding *in personam* jurisdiction. Plaintiff fully complied with the West Virginia MPLA by submitting a proper Certificate of Merit outlining, with particularity, the specific breaches in the nursing standard of care committed by the individuals at the local facility.  The Certificate of Merit, in pertinent part, provides:

> That my good faith investigation regarding the care and treatment of Raben Crisel revealed that he suffered from avoidable harm and injury as a result of custodial neglect by Huntington Health and Rehabilitation Center.  As a direct result of the neglect, Raben Crisel sustained avoidable and preventable injuries and harm including, but not limited to, multiple falls with head injury. Huntington Health and Rehabilitation Center staff deviated from the standard of care when they failed to provide adequate supervision and modify their care plan to prevent accidents. These avoidable and preventable injuries were directly related to basic custodial neglect, which was perpetrated by Huntington Health and Rehabilitation Center.  The aforementioned conditions and other avoidable injuries were directly caused by the negligence of Huntington Health and Rehabilitation Center, its staff, employee, directors, agents, administration and representatives.

       As "related entities," the SSC Defendants may be held liable for the negligence committed at the local facility by the facility's administrator and nurses.  *See Cunningham v. Herbert J. Thomas Hospital Association*, 737 S.E.2d 272, 275 (W.Va. 2012) and W. Va. Code § 55-7B-2(f), 2(n) and 9(g) (2015) (noting that "nothing in this article is meant to preclude a health care provider from being held responsible for the portion of fault

attributed by the trier of fact to any health care provider's agent or servant or to preclude imposition of fault otherwise imputable or attributable to the health care provider under claims of vicarious liability"). As such, the Screening Certificate of Merit applies not only to the local facility, but also to the SSC Defendants.

The SSC Defendants repeatedly argue that Plaintiff's counsel has attempted to avoid and circumvent the MPLA "via artful pleading." Moreover, in an effort to further impugn the integrity of Plaintiff's counsel, the SSC Defendants boldly assert that Plaintiff's "pre-suit papers are deficient because they are knowingly false" and that "there is compelling proof that Ms. Thomas (the nurse that issued them) conducted no investigation to support her assertion that she had a 'good faith basis or a reasonable belief' that Mr. Crisel was injured by the neglect of SavaSeniorCare, LLC and other non-facility Defendants." (Memorandums at pages 13-16, generally). [4]

It is inconceivable to think that a nursing expert, before issuing a Screening Certificate of Merit, should be required to ascertain the corporate structure of the various corporate entities and determine whether those entities may ultimately be held liable for the neglect that occurred at the local facility. The nursing expert is only tasked with outlining the beaches of standard of care that she observed. The corporate defendants in this case have intentionally made the task of determining who is liable for the neglect occurring at the local facility impossible to ascertain, absent the implementation of discovery. The SSC Defendants would have this Court believe that the local facility is a stand-alone facility, with no ties to any of the named corporate entities. This position is refuted both by the testimony

---

[4] Plaintiff also takes umbrage with another statement made by opposing counsel in his Memorandums and feels compelled to address it with this Court. Opposing counsel expresses the sentiment that Plaintiff's counsel wrote the screening certificate and retained a nursing expert to apply a "mere rubber stamp." This is untrue and Plaintiff's counsel stated as much to opposing counsel well before he filed these Motions. Nonetheless, opposing counsel was apparently compelled to submit these assertions to the Court through his Memorandum, knowing it to be false.

16

of Administrator Annica Stansberry and by the Sims Declarations which make clear that the SSC Defendants share both officers and ownership interests.

Moreover, if opposing counsel had properly consulted with the local facility's counsel, he would have been apprised of the "good faith" basis that Plaintiff's counsel had for including the SSC Defendants as parties to this matter. According to opposing counsel, he conferred with the local facility's counsel to discredit Plaintiff's counsel, by ascertaining that the records from the local facility did not mention SavaSeniorCare or the SSC Defendants: "We conferred with counsel for the local facility who has advised that Mr. Crisel's medical records do not even mention SavaSeniorCare, LLC or the other non-Facility defendants." (Memorandum at 14).   It stands to reason that opposing counsel intentionally failed to ascertain the testimony of Ms. Stansberry or simply chose not to disclose it to this Court.[5]

Finally, to the extent that SSC's counsel is now upset, offended by Plaintiff's counsel for submitting additional Screening Certificates of Merit against all corporate defendants, this Court should take note of the following: Plaintiff's counsel initially proffered a single Screening Certificate of Merit against only the local facility, the only known healthcare provider.   The SSC Defendants were included, as provided for under the MPLA, as related entities. Plaintiff did not initially believe that the SSC Defendants constituted "healthcare providers" as defined by the MPLA and, thus, no Screening Certificates of Merit were necessary.   *See* W. Va. Code § 55-7B-2(g) (noting that a health care provider "means a person, partnership, corporation, professional limited liability company. . .licensed by, or certified in, this state or another, to provide health care..."). *See* W. Va. Code § 55-7B-6(b) (noting that at least thirty days prior to the filing of a medical malpractice professional

---

[5] Current counsel for the local facility, Anders Lindberg, was present at two of the aforementioned depositions of Administrator Annica Stansberry.   Counsel for SSC and the corporate entities and counsel for the local facility are from the same firm.

liability action against a health care provider, the claimant shall serve. . .a notice of claim on

each health care provider the claimant will join in the litigation).  Plaintiff intended to pursue

her claims against SavaSeniorCare, LLC and SSC Defendants through vicarious liability or

under the theory of "corporate negligence" as set forth in the West Virginia case of *Manor*

*Care, Inc. v. Douglas*, 763 S.E.2d 73 (W.Va. 2014). Opposing counsel, however, insisted that

the SSC Defendants required Screening Certificates of Merit.  His letter of July 9, 2015, in

pertinent part provides:

> As you know, W.Va. Code § 55-7B-6 mandates that a suit may
> not be instituted against a WEST VIRGINIA HEALTH CARE
> PROVIDER unless 30 days prior to filing the complaint, each
> healthcare provider to be sued is served with a Notice of Claim
> specifying the theories of liability to be asserted and including a
> Screening Certificate of Merit completed by a qualified expert.
> The West Virginia Supreme Court of Appeals has determined
> that the statutory purposes of these requirements are "(1) to
> prevent the making and filing of frivolous medical malpractice
> claims and lawsuits; and (2) to promote the pre-suit resolution
> of non-frivolous medical malpractice claims."  **As to SSC
> Huntington Operation Company, LLC [sic], SSC Special
> Holdings, LLC [sic], SSC Equity Holdings, LLC, SSC Submaster
> Holdings, LC [sic]  SavaSeniorCare, LLC [sic] and SMV
> Huntington, LLC your Notice of Claim and Screening Certificate
> of Merit are deficient in meeting both the purposes and the
> letter of the statutory mandate.**
>
> **You also failed to comply with the statute by not providing a
> separate screening certificate of merit to each of the potential
> defendants identified in you Notice of Claim.**  Instead, your
> Screening Certificate of Merit is directed only to Huntington
> Health and Rehabilitation Center and is devoid of
> factual/medical claims as to SSC Huntington Operation
> Company, LLC [sic], SSC Special Holdings, LLC [sic], SSC Equity
> Holdings, LLC, SSC Submaster Holdings, LC [sic]
> SavaSeniorCare, LLC [sic] and SMV Huntington, LLC.  As
> required by *Hinchman*, other defects in your Screening
> Certificate of Merit are identified below.

After receiving the letter, Plaintiff's counsel assumed he was wrong in his initial belief

that SavaSeniorCare, LLC and SSC Defendants were not medical providers and, thus,

submitted the additional certificates as requested. The additional certificates are, and should be, identical to the original certificate, as it is the care at the local facility that serves as the genesis of Plaintiff's case. The only questions to be decided are which corporate entities are responsible for the local facility's neglect (vicarious liability) and whether there exists evidence of "ordinary" or "corporate negligence" that falls outside the MPLA.

## IV.   CONCLUSION

The West Virginia Medical Professional Liability Act was drafted by the Legislature to include related entities, such as the SSC Defendants as parties to lawsuits brought under its terms. In the present matter, neither a parties' affidavit, nor the recitation of common law factors intended to distance clearly related entities will serve to defeat the jurisdiction of this Court over proper parties. While the Court has available to it remedies for dismissing parties later found to be outside its jurisdiction, Plaintiff has met and exceeded the minimal standards for a prima facie showing of a jurisdictional basis hereunder. Dismissal of the SSC Defendants would be improper under any of the Rule 12 standards set forth by the Defendants as enough evidence exists at this time to warrant moving forward with Plaintiff's Complaint.

Respectfully submitted,


/s/Andrew L. Paternostro
Andrew L. Paternostro, Esquire (WV Bar No. 5541)
Jeff D. Stewart, Esquire (WV Bar No. 9137)
**THE BELL LAW FIRM, PLLC**
Post Office Box 1723
Charleston, West Virginia 25326
(304) 345-1700 / (304) 345-1715 (Fax)
        *Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

ANGELA THACKER, as Personal
Representative of the Estate of
RABEN CRISEL,

        Plaintiff,

v.                             Civil Action No.: 3:15-CV-13388

SEVENTEENTH STREET ASSOCIATES, LLC d/b/a
HUNTINGTON HEALTH AND REHABILITATION CENTER;
SMV HUNTINGTON, LLC;
SSC HUNTINGTON OPERATING COMPANY LLC;
SSC SUBMASTER HOLDINGS LLC;
SSC EQUITY HOLDINGS MT LLC;
SAVASENIORCARE, LLC; and
SSC SPECIAL HOLDINGS LLC,

        Defendants.

<u>CERTIFICATE OF SERVICE</u>

      I, Andrew L. Paternostro, counsel for Plaintiff, hereby certify that I have electronically filed with the Clerk of Court **PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTIONS TO DISMISS FILED BY DEFENDANTS SSC HUNTINGTON OPERATING COMPANY LLC, SSC SUBMASTER HOLDINGS LLC, SSC EQUITY HOLDINGS MT LLC, AND SSC SPECIAL HOLDINGS LLC** and a true copy of the foregoing shall be served electronically upon all counsel of record as indicated below, on this the 6th day of November, 2015.

                            John J. Meadows, Esquire
                            Steptoe & Johnson, PLLC
                            Post Office Box 1588
                            Charleston, West Virginia 25326
                                  *Counsel for SavaSenior Care, LLC; SSC Submaster Holdings LLC; SSC Special Holdings LLC; SSC Equity Holdings MT LLC; SMV Huntington LLC; and SSC Huntington Operating Company, LLC*

Anders W. Lindberg, Esquire
Jessica J. Wiley, Esquire
Andrew P. Smith, Esquire
P.O. Box 2195
Huntington, West Virginia 25722
> *Counsel for Seventeenth Street Associates, LLC d/b/a Huntington Health and Rehabilitation Center*


/s/Andrew L. Paternostro
Andrew L. Paternostro, Esquire (WV Bar No. 5541)
Jeff D. Stewart, Esquire (WV Bar No. 9137)
**THE BELL LAW FIRM, PLLC**
Post Office Box 1723
Charleston, West Virginia 25326
(304) 345-1700 / (304) 345-1715 (Fax)
*Counsel for Plaintiff*